UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DEWAN J. STEVENSON, | ) | |
| | ) | |
| Plaintiff, | ) | 12 C 3094 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| UNITED AIRLINES, INC., IAM-AW LODGE 141, | ) | |
| JAY GEGENHEIMER, and ALEX GERULIS, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Dewan Stevenson brought this suit against his former employer, United Airlines, Inc.; United employee Jay Gegenheimer; his union, the International Association of Machinists and Aerospace Workers Lodge 141 ("the Union"); and Union representative Alex Gerulis. Doc. 1. The complaint alleges race discrimination in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Docs. 1, 81. The court recruited counsel to represent Stevenson, Doc. 8, and after the case was reassigned to the undersigned judge, Doc. 68, recruited counsel sought and was granted leave to withdraw from representing Stevenson on his claims against the Union and Gerulis, Docs. 79, 82. Now before the court are summary judgment motions filed by United and Gegenheimer, Doc. 98, and by the Union and Gerulis, Doc. 91. The motions are granted.

**Background**

The following facts are set forth as favorably to Stevenson as the record and Local Rule 56.1 permit.[*] *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). On summary judgment,

---

[*] The two sets of defendants filed separate Local Rule 56.1(a)(3) statements, Docs. 93, 100, to which Stevenson has filed separate Local Rule 56.1(b)(3)(B) responses, Docs. 119, 127. The undersigned judge's usual practice is to cite only to the Local Rule 56.1(b)(3)(B) responses,

1

the court must assume the truth of those facts, but does not vouch for them. *See Smith v. Bray*, 681 F.3d 888, 892 (7th Cir. 2012).

Stevenson, an African-American male, worked as a ramp serviceman for United at O'Hare International Airport's international terminal. Doc. 127 at ¶ 5. The Union was Stevenson's exclusive bargaining agent. *Id*. at ¶ 6. Like other United employees, Stevenson had two security cards: a "city badge" issued by the City of Chicago, which permitted access past airport security, and an "EPS card" issued by United, which tracked his hours for payroll purposes. *Id*. at ¶¶ 25-26.

In 2009, United received anonymous letters claiming that employees in the international terminal were engaged in drug use and other improprieties. *Id*. at ¶ 38; Doc. 138 at ¶ 1. The letters also stated that several employees were part of a so-called "timecard swipe club," whose members took turns swiping absent members' cards, which caused United's records to reflect the absent members as working when in fact they were not. Doc. 127 at ¶ 38; Doc. 138 at ¶ 1.

United told the Federal Bureau of Investigation about the allegations and the Bureau in early August 2009 conducted a surprise search of employee lockers in the international terminal. Doc. 127 at ¶¶ 40-41. Stevenson was told that the search indicated that his locker contained drugs. Doc. 138 at ¶ 2. Gegenheimer, a United safety supervisor, ordered Stevenson to submit to a drug test, which the applicable collective bargaining agreement ("CBA") authorized upon reasonable suspicion. Doc. 127 at ¶ 43; Doc 138 at ¶ 4. Gegenheimer drove Stevenson to a medical facility to be tested and confiscated his employee badge. Doc. 127 at ¶ 45; Doc. 138 at

---

which should contain a "concise summary" of each paragraph in the Local Rule 56.1(a)(3) statement along with the non-movant's "concise response." Citations to United and Gegenheimer's asserted facts will follow this practice. However, because many of Stevenson's responses to the Union and Gerulis's Local Rule 56.1(a)(3) statement are lengthy, confusing, or inapposite, the court will cite both Doc. 93 (their Local Rule 56.1(a)(3) statement) and Doc. 119 (Stevenson's Local Rule 56.1(b)(3)(B) response).

¶ 7. The test report concluded that Stevenson was "'unfit' for duty pending laboratory confirmation." Doc. 127 at ¶ 46. After completing a rehabilitation program in October 2009, Stevenson was cleared to return to work. *Id*. at ¶¶ 47, 52.

Meanwhile, United expanded its timecard investigation to cover the employees whose lockers had been searched. *Id*. at ¶ 53. United compared those employees' city badge records with their EPS card records. *Id*. at ¶ 54. United also analyzed those individuals' "ring correction forms," which employees can use to correct their timesheets if they forget to swipe in with their EPS card. *Id*. at ¶¶ 11, 55; Doc. 138 at ¶ 12. The investigation led United to suspect that Stevenson had submitted false ring correction forms on two occasions. Doc. 127 at ¶¶ 55-60. The first form, pertaining to July 3, 2009, indicated that Stevenson had arrived at his worksite at 11:00 a.m. *Id*. at ¶ 56. Yet the City's records for that day showed that Stevenson did not swipe through airport security until 10:56 a.m.; United suspected, and Stevenson later admitted, that he could not have traveled from security to his worksite in the four minutes that elapsed from 10:56 and 11:00. *Id*. at ¶ 57. The second form, pertaining to July 21, 2009, indicated that Stevenson had been at work, although the City's records did not show him swiping through airport security at all. *Id*. at ¶ 59.

A United rule, "Rule 3," prohibits falsifying timecards or payroll records, and a violation of that rule can result in discharge "unless mitigating factors are considered applicable." Doc. 93 at ¶¶ 12-13; Doc. 119 at pp. 10-11; Doc. 127 at ¶ 10. Pursuant to the CBA, United afforded Stevenson an "Investigative Review Hearing" on October 19, 2009. Doc. 127 at ¶¶ 18-19, 61. At the hearing, a Union representative argued that both of Stevenson's ring correction forms were accurate. Stevenson claimed to have arrived at O'Hare early on July 3, but without his city badge, passing through security with the help of a friendly guard; he further claimed that he left

3

the worksite to meet his wife, swiping his city badge at 10:56 a.m. on the way back to his post. *Id*. at ¶ 62. On July 21, Stevenson said, he again forgot his city badge and was waved through security by a guard. *Id*. at ¶ 58. A coworker of Stevenson's testified that he remembered seeing Stevenson at work on July 21. *Id*. at ¶ 63. The hearing officer rejected these explanations, reasoning that "the preponderance of the evidence supports the conclusion that Mr. Stevenson did not work at all" on July 21 and that he was not at work at 11:00 am on July 3. Doc. 93 at ¶ 28; Doc. 119 at pp. 32-33. On December 1, 2009, the hearing officer issued his decision discharging Stevenson. Doc. 127 at ¶ 64.

The CBA gives Union members the right to grieve discharge decisions to a member of United's human resources department and an Assistant General Chairman of the Union; if the parties do not agree on how to resolve the grievance, United holds a so-called "Step Three Hearing." Doc. 93 at ¶¶ 21-22; Doc. 119 at pp. 29-30. Gerulis was assigned to investigate Stevenson's case in preparation for the Step Three Hearing. Doc. 93 at ¶ 29; Doc. 119 at p. 34. Gerulis directed another Union member to interview an employee alongside whom Stevenson was supposed to be working on July 22. Gerulis also spoke to the security guard that Stevenson claimed had admitted him without his city badge; the guard told Gerulis that he would testify in Stevenson's favor. Doc. 93 at ¶¶ 30-32; Doc. 119 at pp. 34-35. In addition, Gerulis interviewed the supervisor who signed Stevenson's ring correction form, but the supervisor could not remember anything specific about the days in question. Doc. 93 at ¶ 33; Doc. 119 at p. 35.

At the Step Three Hearing, the Union called Stevenson's coworker to testify that he saw Stevenson at work on July 21. Doc. 93 at ¶ 38; Doc. 119 at p. 37. The security guard did not attend the hearing, and Gerulis argued that the guard had been intimidated into not testifying and would have confirmed that he admitted Stevenson on July 21. Doc. 93 at ¶ 39; Doc. 119 at pp.

37-38. In a decision issued on May 20, 2011, a United hearing officer upheld Stevenson's termination. Doc. 93 at ¶ 40; Doc. 119 at p. 38; Doc. 127 at ¶ 66.

Following an unfavorable Step Three decision, the Union has the option under the CBA to proceed to arbitration. Doc. 93 at ¶ 24; Doc. 119 at p. 31. In Stevenson's case, the Union decided not to do so. Doc. 93 at ¶ 46; Doc. 119 at p. 39; Doc. 127 at ¶ 66. The Union maintains that it declined to arbitrate Stevenson's case because its investigation and prior experience suggested that the prospects for success were dim, although Stevenson disputes this assessment. Doc. 93 at ¶¶ 46-57; Doc. 119 at pp. 39-43.

On October 27, 2011, Stevenson filed a charge of discrimination against United with the Equal Opportunity Employment Commission ("EEOC") and the Illinois Department of Human Rights ("IDHR"), alleging race discrimination. Doc. 127 at ¶ 78. The EEOC issued a right to sue letter on January 30, 2012. *Id*. at ¶ 79.

**Discussion**

Stevenson claims that United and the Union violated Title VII of the Civil Rights Act and 42 U.S.C. § 1981, United by treating him less favorably, and the Union by representing him less ably, than white employees. Stevenson also claims that Gegenheimer and Gerulis violated § 1981. Although there are some differences between the two statutes, *see Smith v. Bray*, 681 F.3d 888, 896 n.2 (7th Cir. 2012), "the methods of proof and elements of a Section 1981 case are essentially identical to those in a Title VII case." *Morgan v. SVT, LLC*, 724 F.3d 990, 995 (7th Cir. 2013) (internal quotations marks and alterations omitted); *see also Skylarsky v. Means-Knaus Partners, L.P.*, 777 F.3d 892, 896 (7th Cir. 2015) ("the same analysis applies to both theories of liability"); *Egonmwan v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 845, 850 n.7 (7th Cir.

2010) (same). Accordingly, the court will simplify by referring to Title VII doctrine and precedents throughout this opinion.

**I.       Claims Against United**

As an initial matter, United claims that Stevenson's Title VII claim is barred because his EEOC charge was untimely. Doc. 102 at 5-7. Section 1981 claims are not subject to an analogous exhaustion requirement. *See Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 539 (7th Cir. 2009). Because Title VII and § 1981 claims are subject to the same substantive standards, and because both claims fail on the merits, there is no need to address the timeliness issue with respect to the Title VII claim.

A Title VII plaintiff faced with a summary judgment motion may proceed under either the direct method or the indirect method. *See Simpson v. Beaver Dam Comm. Hosps., Inc.*, 780 F.3d 794, 789-90 (7th Cir. 2015). Stevenson has elected to proceed against United only under the indirect method. Doc. 130 at 6. That method, first articulated in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802-05 (1973), has three steps. First, the plaintiff must make out a prima facie case of discrimination, which requires him to establish that (1) he is a member of a protected class, (2) his job performance met his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) another similarly situated individual who was not in the protected class was treated more favorably than he was. *See Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012). Second, if the plaintiff makes out a prima facie case, "[t]he burden … shift[s] to the employer to articulate some legitimate, nondiscriminatory reason" for its action. *Ibid.* (quoting *McDonnell Douglas*, 411 U.S. at 802). Third, if the defendant articulates a legitimate, non-discriminatory reason, the burden shifts back to the plaintiff, who must provide evidence that the defendant's stated reason is pretextual. *Ibid.*

### A. Prima Facie Case

The only elements of the prima facie case in dispute are whether Stevenson met United's legitimate performance expectations and whether he has identified any similarly situated individuals outside the protected class who were treated better than he was. United argues that Stevenson was not meeting its legitimate performance expectations for two reasons. Doc. 102 at 8-9. First, even before United began investigating the timecard swipe club, Stevenson had been disciplined for poor attendance and was aware that any further attendance violations would result in his discharge. Doc. 127 at ¶¶ 35-36. Second, after his drug test, Stevenson was deemed "unfit for duty" and was not cleared to return to work until October 2009. *Id*. at ¶¶ 46-47, 52.

These arguments are unpersuasive. Although Stevenson may not have been a model employee, not even United thought that those particular shortcomings justified his discharge. United terminated Stevenson for falsifying his ring correction forms, not for poor attendance. And United itself believed that Stevenson "was eligible to return to work" after he completed his drug treatment program. *Id*. at ¶ 52.

The only close question, then, is whether Stevenson has identified any similarly situated individuals outside the protected class. "Similarly situated employees must be directly comparable to the plaintiff in all material respects," but they need not be "clones." *Coleman*, 667 F.3d at 846 (internal quotation marks omitted). As a general rule, the plaintiff must show that a comparator "(1) dealt with the same supervisor, (2) was subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish his conduct or the employer's treatment of him." *Orton-Bell v. Indiana*, 759 F.3d 768, 777 (7th Cir. 2014) (alterations and internal quotation marks omitted). So described, the various elements of the similarly-situated inquiry overlap somewhat with the second and third

steps of the *McDonnell Douglas* analysis. *See Rodgers v. White*, 657 F.3d 511, 520 (7th Cir. 2011) ("[t]he analysis of the prima facie case and pretext often overlap").

Stevenson proposes numerous similarly situated individuals, but most are not even close to being relevant comparators. Stevenson asserts that he was similarly situated to Jeff Schwede, Rob Roolie, Larry Thompson, Linda Dombrowski, and Frank Beltran, all "non-African-American employees who," he says, "falsified time by virtue of using ring corrections" but avoided discipline. Doc. 130 at 15; Doc. 138 at ¶ 37. Stevenson testified at his deposition that it was "general information" and "knowledge among the ramp" that United "changed … ring corrections" for those employees. Doc. 99-1 at 48-49. He admitted, however, that he had never spoken with any of those employees and had not seen their personnel files. *Id.* at 49. When United's attorney pressed Stevenson at his deposition to name his sources, Stevenson repeated that it was "general information" and said that his sources were: "Everyone. Everyone. Everyone. Everyone." *Ibid*.

United correctly argues that Stevenson has not adduced any admissible evidence to show that Schwede, Roolie, and the others were similarly situated. Stevenson, who admits that he lacks any personal knowledge about the employees' time sheets, cannot rely on "general information" about what these employees did, as settled law holds that "mere conclusory allegations do not constitute evidence." *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010). Nor can Stevenson rely on statements by United employees on "the ramp," at least not without showing why the hearsay bar does not apply. *See Wigod v. Chi. Mercantile Exch.*, 981 F.2d 1510, 1519 (7th Cir. 1992) ("[t]o be considered" at summary judgment, "statements by the unidentified parties must either be non-hearsay pursuant to Federal Rule of Evidence 801, or must qualify for a hearsay exception pursuant to Federal Rule of Evidence

8

803"). A coworker's out-of-court statement, for example, may fall outside the hearsay rule under Federal Rule of Evidence 801(d)(2)(D), but only if the coworker's "duties … encompass[ed] some responsibility related to the decisionmaking process affecting the employment action." *Makowski v. SmithAmundsen, LLC*, 662 F.3d 818, 822 (7th Cir. 2011). Stevenson does not even name the out-of-court declarants, let alone provide a basis for believing that they had responsibility for keeping track of employee time. So their statements cannot come in on that basis.

Stevenson next argues that Eddie Lagarda, Karen Perreira, Julie Nichols, and Michael Salerno were similarly situated because they violated Rule 3 and yet were not discharged. Doc. 130 at 13; Doc. 138 at ¶ 38. The evidence Stevenson points to, however, lacks any detail on the circumstances of their Rule 3 violations, their Investigative Review Hearings, or any Step Three Hearings. Without such evidence, it is impossible to evaluate whether these employees were similarly situated to Stevenson. Under governing precedent, "it was up to [Stevenson] to find others who were directly comparable in all material respects." *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 740 (7th Cir. 2006) (internal quotation marks omitted). Stevenson's failure to provide any details of those four employees' circumstances precludes him from meeting that burden.

Stevenson provides more detail about two other coworkers. The first is Derek Ladas, a ramp serviceman who was accused of violating Rule 3 and who received a discharge from the same hearing officer as Stevenson. Doc. 138 at ¶ 32. Ladas ultimately was not fired, for United let him return to work after he signed a "Last Chance Agreement," an option never offered to Stevenson. *Id*. at ¶¶ 34-35. United argues that Ladas is not similarly situated to Stevenson because it had good reasons for offering Ladas but not Stevenson a Last Chance Agreement.

9

Doc. 102 at 11-12. United may be right, but its argument is more apt for the second and third stages of the *McDonnell Douglas* inquiry. *See Coleman*, 667 F.3d at 851 n.4 ("The similarly-situated inquiry is about whether employees are *objectively* comparable, while the pretext inquiry hinges on the employer's *subjective* motivations."). For now, the court will assume without deciding that Ladas, while not precisely analogous to Stevenson, is "sufficiently comparable to [him] to suggest that [he] was singled out for worse treatment." *Crawford v. Ind. Harbor Belt R.R. Co.*, 461 F.3d 835, 846 (7th Cir. 2006). The burden therefore shifts to United to offer a legitimate, non-discriminatory reason for terminating Stevenson for violating Rule 3 while declining to terminate Ladas; this is discussed in Section I.B, *infra*.

Stevenson's last proposed comparator, Justin Skjoldager, was implicated in the time-card investigation and the FBI's drug search. Doc. 138 at ¶¶ 21, 23. Contrary to Stevenson's arguments, Skjoldager is not similarly situated. Stevenson believes that United's records reveal thirteen days on which Skjoldager swiped in manually or with his EPS card, but for which the City has no record of him passing through security. Doc. 130 at 11-12; Doc. 138 at ¶ 28. On May 28, 2009, for instance, the City's records indicate that Skjoldager did not pass through security, Doc. 126-4 at 4, but United's EPS records show that Skjoldager swiped his EPS card at 10:48 a.m. Doc. 126-3 at 12. From this data, Stevenson concludes that Skjoldager also falsified his time records and "yet received no discipline whatsoever." Doc. 130 at 11.

United responds that Stevenson has simply misread the records: properly interpreted, the EPS records show that Skjoldager did nothing wrong to begin with. Doc. 139 at 9-10. According to United's project manager, the EPS system creates duplicate entries any time an employee swipes his EPS card before his daily shift is scheduled to start. Doc. 138 at ¶ 28; Doc. 138-1 at ¶ 5. Indeed, Skjoldager's swipe-in at 10:48 a.m. on May 28 matches a swipe-in at 10:48

am on May 29, Doc. 126-3 at 12, indicating that the May 28 record truly is a duplicate of an early swipe the following day. And, as United shows, *all* of "the single EPS time entries [for Skjoldager] that [Stevenson] points to as 'inconsistent' are actually duplicate entries caused by an early arrival for the next day's shift." Doc. 139 at 9; *see* Doc. 126-3 at 12-13 (showing that on each day Stevenson contends that Skjoldager did not work, the entry is missing a "swipe-out" time and the following day contains an identical "swipe-in" time as well as a "swipe-out" time).

Stevenson also contends the records show that Skjoldager swiped his EPS card on July 2 just three minutes after swiping his City badge. Doc. 130 at 11; Doc. 126-3 at 12; Doc. 126-4 at 4. (Remember that United accused Stevenson of falsifying his ring correction form on July 3 in part because it determined he could not have passed from security to his worksite in just four minutes.) But the EPS and City badge exhibits do not indicate whether Skjoldager swiped at the same security entrance or whether Skjoldager was assigned to the same worksite as Stevenson. There is accordingly no basis to conclude that Skjoldager's three-minute window between swipes on July 2 should have raised the same concern as Stevenson's four-minute window the following day. Nor is there any reason to believe that Skjoldager violated Rule 3 by falsifying a ring correction form on July 2. As Stevenson himself explains, the letter "C" appears next to entries in the EPS records that have been manually corrected. Doc. 138 at ¶ 25. Yet Skjoldager's July 2 entry has the letter "A" next to it, Doc. 126-3 at 13, indicating that it was generated automatically.

Stevenson has therefore failed to show that Skjoldager is similar to him in all material respects. He has not advanced any grounds for doubting United's interpretation of its own records; he has not even pointed the court to his own timesheets so the court could evaluate whether United was applying its interpretation evenhandedly. All Stevenson has provided to

11

show that Skjoldager is similarly situated is his own unfounded interpretation of Skjoldager's EPS records, but that is not enough to stave off summary judgment. *See Trentadue v. Redmon*, 619 F.3d 648, 652 (7th Cir. 2010) (holding that the party opposing summary judgment "must show more than some metaphysical doubt as to the material facts … and neither speculation nor generic challenges to a witness's credibility are sufficient to satisfy this burden") (internal quotation marks omitted). Because the record provides no basis to conclude that Skjoldager "engaged in similar conduct" as Stevenson, Skjoldager is not a viable comparator. *Orton-Bell*, 759 F.3d at 777.

### B. Legitimate, Non-Discriminatory Reasons and Pretext

Even if the court were wrong about Skjoldager not being similarly situated to Stevenson, United argues that it legitimately treated both Skjoldager and Ladas differently than Stevenson. United says it decided to reinstate Ladas on a Last Chance Agreement because a witness testified at his Step Three hearing that there "was a plausible swipe activity by Ladas" and a supervisor testified favorably to Ladas's credibility. Doc. 138 at ¶ 34. Afterwards, the Step Three hearing officer stated "that he was going to sustain … Ladas's grievance" and recommended that the parties resolve the matter. Doc. 127 at ¶ 34. By contrast, the same hearing officer did not think Stevenson's story was "plausible," did not indicate that he was going to sustain his grievance, and did not recommend that United resolve the grievance. Doc. 127 at ¶¶ 64-66; Doc. 138 at ¶ 34. United explains that it did not terminate Skjoldager because its records did not suggest that he did anything wrong in the first place. Doc. 139 at 4. These both qualify as a legitimate, nondiscriminatory reasons for United to treat Stevenson differently than either of his coworkers.

With United having satisfied its burden at the second stage of the *McDonnell Douglas* analysis, the burden shifts back to Stevenson to show that United's proferred reasons for not

12

terminating Skjoldager and Ladas are pretextual. To meet this burden, Stevenson "must identify such weaknesses, implausibilities, inconsistencies, or contradictions in the defendant's proffered reasons that a reasonable person could find them unworthy of credence and hence infer that the defendant did not act for the asserted non-discriminatory reasons." *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 465 (7th Cir. 2014). "Pretext is more than just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action." *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 743-44 (7th Cir. 2011) (alterations and internal quotation marks omitted). Stevenson makes several pretext arguments, all lacking merit.

First, Stevenson argues that United's explanation for giving Ladas a Last Chance Agreement—that Ladas's supervisor vouched for his credibility—fails to persuade because Stevenson also "produced witnesses factually substantiating his account that he actually worked the days and times he was accused of falsifying." Doc. 130 at 13. Stevenson must do more than point out that United should have believed his witness as it believed Ladas's witnesses, however. There is nothing "weak[], implausib[le], inconsisten[t], or contradict[ory]," *Widmar*, 772 F.3d at 465, in the hearing officer's believing a character witness in one hearing (Ladas's supervisor) while disbelieving a fact witness in another (the coworker who remembered seeing Stevenson on July 21). Triers of fact, who see the witnesses testify and evaluate their testimony in light of the other evidence presented, make those judgments all the time. *See Everle-Wehle v. United Parcel Serv., Inc.*, 181 F.3d 898, 900 (8th Cir. 1999) (finding no evidence of pretext where the employer's decision was based on its own "credibility determinations … [made] reasonably and in good faith").

Second, Stevenson accuses United of not actually investigating Skjoldager even though he was implicated in the swipe card club. Doc. 130 at 17-18. But Stevenson himself cites

13

uncontradicted testimony from the responsible United official that Skjoldager's records were in fact pulled and reviewed. Doc. 139 at ¶ 21 (citing Doc. 99-7 at 15, 18). And one of the charts on which Stevenson relies shows that there was an "Investigation IN PROCESS" for *both* Stevenson and Skjoldager, among numerous others, which overcomes any possible suggestion that Skjoldager was not investigated. Doc. 126-9 at 2. In any event, as described above, United has cogently explained that the alleged discrepancies in Skjoldager's timesheets are a result of the way United's EPS system is designed. "If the evidence does not amply support a plaintiff's claim that the defendant's explanation is unworthy of credence, judgment as a matter of law is entirely appropriate." *Silverman*, 637 F.3d at 739.

Third, Stevenson argues that he never falsified his time records. Doc. 130 at 18-19. If true, United's decision to discharge Stevenson was a mistake, but a mistake is not pretext. As the Seventh Circuit has explained, "arguing about the accuracy of the employer's assessment is a distraction in the pretext context; the fact that a statement is inaccurate does not mean that it is a deliberate lie." *Collins v. Am. Red Cross*, 715 F.3d 994, 1000 (7th Cir. 2013) (internal quotation marks omitted). All the evidence here shows that United honestly believed Stevenson falsified his time records in a manner warranting dismissal. *See Silverman*, 637 F.3d at 733-34 (holding that pretext must be a "lie" or "phony reason," not an error in judgment).

Fourth, Stevenson points out that eleven of the nineteen cases for which United proposed discharges in 2009 involved African-American employees, and of those eleven employees, eight were "separated from employment" and four filed lawsuits or "made allegations" of race discrimination. Doc. 130 at 18; Doc. 138 at ¶¶ 39-40. While the Seventh Court has "rejected efforts to use statistics as the primary means of establishing discrimination in disparate treatment situations," it also held that "[i]n conjunction with other evidence … statistics can be probative

of whether the alleged disparity is the result of discrimination." *Bell v. EPA*, 232 F.3d 546, 552 (7th Cir. 2000). Stevenson has not provided any "other evidence," and even so, his statistical evidence is extremely flimsy. He does not explain what proportion of servicemen on the ramp were African-American, why eleven out of nineteen cases are statistically significant for purposes of the employees' racial backgrounds, or how the four lawsuits or allegations were resolved or what their significance should be. And United offers its own anecdotal evidence, noting that two of the three servicemen it gave Last Chance Agreements to in 2009 were African-American. Doc. 127 at ¶¶ 76-77. Under these circumstances, Stevenson's "meager statistical evidence does not constitute the rare case where statistics alone can create a triable issue of pretext." *Guerrero v. Ashcroft*, 253 F.3d 309, 316 (7th Cir. 2001).

Fifth, Stevenson argues that his discipline was "drawn out," while Skjoldager's was quickly resolved. Doc. 130 at 18. Once again, however, United has shown—and Stevenson has provided no reason to doubt—that Skjoldager's situation was handled differently because his timecard records contained no true inconsistencies. Doc. 138 at ¶ 28; Doc. 139 at 13. What is more, it is not clear why the fact that Stevenson's disciplinary proceedings were "drawn out" shows that United's reasons for not disciplining Skjoldager were pretextual

Sixth, Stevenson asserts that United "obstructed" his hearing by "issuing a memorandum stating that [security] officers were not permitted to testify at disciplinary hearings." Doc. 138 at ¶ 19. He attributes the security guard's failure to testify at his hearing to that supposed action by United. Doc. 130 at 18. However, Stevenson's own evidence shows that the Transportation Security Administration, not United, issued the memorandum, so United cannot be held responsible for the memorandum's alleged obstruction of the security guard's participation at the hearing. Doc. 126-18 at 35.

In sum, Stevenson has not shown that a reasonable jury could find that United's legitimate, non-discriminatory reasons for terminating him but not Ladas or Skjoldager are pretextual. Accordingly, summary judgment is awarded to United on the Title VII and § 1981 claims.

## II. Claim Against Gegenheimer

To state a § 1981 claim against Gegenheimer, Stevenson must show that (1) he is "a member of a racial minority," (2) Gegenheimer "intended to discriminate on the basis of race," and (3) Gegenheimer deprived him "of one or more rights enumerated in § 1981." *Black Agents & Brokers Agency, Inc. v. Near North Ins. Brokerage, Inc.*, 409 F.3d 833, 837 (7th Cir. 2005). So far as the record shows, besides ordering Stevenson to submit to a drug test, confiscating his badge, and driving him to the testing facility after the FBI search indicated that drugs were found in his locker, Gegenheimer's only interaction with Stevenson was in 2000, when Gegenheimer told Stevenson to take off his hat to comply with United's dress code. Doc. 127 at ¶¶ 32, 45; Doc. 138 at ¶¶ 3, 9. Even if ordering Stevenson to submit to a drug test and confiscating his badge deprived him of "rights enumerated in § 1981," Stevenson cannot show that Gegenheimer intended to deprive him of those rights on the basis of race. The *only* ground that Stevenson has advanced to show discriminatory intent is that "[i]n addition to the present case, Mr. Gegenheimer has been accused of racial discrimination by another black male previously." Doc. 138 at ¶ 10. (United notes that its Human Resources department investigated that claim and found it meritless. *Ibid*.). This falls woefully short of proof of discriminatory intent under any method. Because no reasonable jury could find on this record that Stevenson has proved the intent element of his § 1981 claim against Gegenheimer, judgment is granted to Gegenheimer.

16

**III.    Claims Against the Union and Gerulis**

A prima facie case of race discrimination under Title VII against a union requires evidence that (1) the employer "violated the collective bargaining agreement," (2) the union "breached its own duty of fair representation by letting the breach go unrepaired," and (3) "that some evidence indicates animus against [the plaintiff's race] motivated" the union. *Greenslade v. Chi. Sun-Times, Inc.*, 112 F.3d 853, 866 (7th Cir. 1997); *see also Babrocky v. Jewel Food Co.*, 773 F.2d 857, 868 (7th Cir. 1985). Even assuming that Stevenson has satisfied the first two elements, the record would not allow a reasonable jury to find that Stevenson's race motivated the Union and Gerulis to provide deficient representation or to waive the Union's right to proceed to arbitration on his behalf.

Stevenson's Local Rule 56.1(b)(3)(B) response contains a litany of complaints about the Union and Gerulis's performance at the Internal Review Hearing and the Step Three Hearing, but says very little about their underlying motivation. What little the Local Rule 56.1(b)(3)(B) response does say about their motivation is often unaccompanied by citation to admissible evidence in the record, which violates the Local Rules and warrants disregarding those assertions. *See* N.D. Ill. L.R. 56.1(b)(3)(B) (requiring the non-movant to file "(3) a concise response to the movant's statement that shall contain: … (B) a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon"); *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 360 (7th Cir. 2009) ("[w]e have repeatedly held that the district court is within its discretion to strictly enforce compliance with its local rules regarding summary-judgment motions"); *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817-18 (7th Cir. 2004) ("[W]here a non-moving party denies a factual allegation by the

17

party moving for summary judgment, that denial must include a specific reference to the affidavit or other part of the record that supports such a denial. Citations to an entire transcript or to a lengthy exhibit are not specific and are, accordingly, inappropriate.").

For example, quoting his EEOC charge, Stevenson states: "I believe that I have been discriminated against because of my race, Black, in Violation of Title VII." Doc. 119 at p. 6. This allegation is unsupported by a citation to the record; in any event, Stevenson's personal beliefs are insufficient to forestall summary judgment. *See Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 548 (7th Cir. 2011) ("If the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed."); *McMillian v. Svetanoff*, 878 F.2d 186, 190 (7th Cir. 1989) ("subjective beliefs of the plaintiff … are insufficient to create a genuine issue of material fact"). Stevenson also accuses United of disproportionately targeting African-American employees for discipline and suggests that the Union was complicit in this practice by not zealously representing African-Americans. Doc. 119 at p. 40. Again, this paragraph is not supported by record evidence and thus is disregarded.

Stevenson further asserts that Union harbored personal animus towards him. *Id*. at pp. 20, 25-26. But mere personal animus towards an employee with a protected characteristic does not permit an inference that decisions were based on that characteristic. *See Hall v. City of Chicago*, 713 F.3d 325, 333 (7th Cir. 2013) (holding that the "coincidence" of the plaintiff's protected characteristic and animus towards the plaintiff "alone does not provide an inference of … discrimination"); *Overly v. KeyBank Nat'l Ass'n*, 662 F.3d 856, 864 (7th Cir. 2011) (affirming summary judgment because the evidence "suggest[ed] that the conduct was the result of personal animus towards [plaintiff], rather than … discrimination").

Stevenson also fails to adduce any admissible evidence that the Union and Gerulis treated any similarly situated employee outside the protected class more favorably than Stevenson. Stevenson does assert that "non-black members received [e]ffective representation." Doc. 119 at p. 6. But once again, the assertion is not supported by any record evidence. Stevenson also asserts that Ladas was treated more favorably because he was not discharged. Doc. 119 at pp. 21-23, 27; Doc. 143 at 2-3. However, United made the discharge decisions, not the Union, and so this assertion cannot support a discrimination claim against the Union.

Stevenson twice asserts that the Union and Gerulis provided better representation to others than they did to him. The first such assertion is not supported by record evidence. Doc. 119 at p. 21. The second does cite evidence, *id*. at pp. 23-24, but that evidence merely recites the facts of Ladas's case—that United accused him of violating Rule 3, but allowed him to sign a Last Chance Agreement. Doc. 91-1 at 34-35. Such evidence says nothing about the Union's representation of the two individuals, let alone that the allegedly substandard representation of Stevenson was motivated by his race.

Finally, addressing the Union's assertion that Gerulis did not call the supervisor that signed Stevenson's ring correction form because he felt doing so "was usually counterproductive," Doc. 93 at ¶ 34, Stevenson responds that "Gerulis has, contrarily, allowed a 'supervisor[]' to testify in support of Derek Ladas[']s Rule #3 violations also investigated [sic], during the related period, as Plaintiff." Doc. 119 at 36. But the record evidence cited by Stevenson concerns *United's* investigation into the timecard swipe club, Doc. 126-9 at 2 (Bates UAL3607), and says nothing about the Union and Gerulis or their relative treatment of Ladas and Stevenson.

Because Stevenson has not provided any evidence to show that the Union or Gerulis intended to discriminate against him on the basis of his race, summary judgment is proper for both defendants.

**Conclusion**

For the foregoing reasons, Defendants' summary judgment motions are granted. Judgment will be entered in favor of Defendants and against Stevenson.

May 1, 2015

United States District Judge